NORWEST CORPORATION AND AFFILIATED COMPANIES, FORMERLY NORTHWEST BANCORPORATION AND AFFILIATED COMPANIES, NORWEST BANK FORT DODGE, N.A., FORMERLY FIRST NATIONAL BANK, AND NORWEST BANK MARION, N.A., FORMERLY FIRST NATIONAL BANK OF MARION, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Norwest Corp. v. Commissioner
Docket No. 37288-86
United States Tax Court
T.C. Memo 1992-282; 1992 Tax Ct. Memo LEXIS 312; 63 T.C.M. (CCH) 3023; May 18, 1992, Filed *312 Decision will be entered under Rule 155. David R. Brennan and Walter A. Pickhardt, for petitioner. William G. Merkle, for respondent. JACOBS
JACOBS
MEMORANDUM OPINION JACOBS, Judge: Respondent determined deficiencies in the Federal income tax of Norwest Corporation and Affiliated Companies (Norwest), Norwest Bank Fort Dodge, N.A., formerly First National Bank, and Norwest Bank Marion, N.A., formerly First National Bank of Marion. The parties have resolved their differences with respect to these deficiencies. In the petition, Norwest claimed an overpayment of tax based on its alleged entitlement to foreign tax credits for Brazilian withholding taxes on interest income which it received on net loans made to Brazilian borrowers. Pursuant to the terms of a net loan, the borrower is contractually obligated to pay all Brazilian taxes due on interest paid to the lender. During the years involved, the Brazilian borrowers received subsidies from the Brazilian Government equal to a percentage of the taxes withheld on the interest tendered. The specific issues which we must decide are: (1) Whether any part of the Brazilian withholding taxes is a creditable foreign tax under section *313 901; [1] and if so, then (2) whether the subsidies the Brazilian Government paid to Brazilian borrowers should reduce the amount of the foreign tax credit. These issues are the same as those we confronted in First Chicago Corp. v. Commissioner, T.C. Memo. 1991-44, the consolidated cases of Continental Illinois Corp. v. Commissioner, T.C. Memo. 1988-318, affd. without published opinion sub nom. Citizens and Southern Corp. v. Commissioner, 919 F.2d 1492 (11th Cir. 1990) (the Continental Illinois case), and Nissho Iwai American Corp. v. Commissioner, 89 T.C. 765 (1987). The amount of Brazilian foreign tax credits at issue is $ 398,318 for 1980 and $ 523,806 for 1982.
This case was submitted to the Court fully stipulated pursuant to Rule *314 122. Many of the facts stipulated are derived from the record in the Continental Illinois case. The stipulation of facts and attached exhibits are incorporated herein. Background
Each petitioner's principal place of business was in Minneapolis, Minnesota, at the time the petition was filed. Norwest is the parent company of a group of corporations which filed consolidated income tax returns for the years in issue. Norwest regularly made loans to borrowers located in foreign countries, including Brazil. It maintained a representative office in San Paulo, Brazil, but because of restrictions imposed by Brazilian law, the representative office did not enter into loan transactions but rather recommended them to Norwest's head office in Minneapolis. Brazilian Regulation of Foreign Lending
Brazil imposed restrictions on the receipt and exchange of foreign currency. By law, the Banco Central do Brasil (Central Bank) registered and approved all loans from foreign lenders to Brazilian borrowers. Through the registration process, the Central Bank set the range of acceptable interest rates and periodically established the minimum repayment terms of loans. Once the Central *315 Bank approved a loan, the lender remitted the proceeds in foreign currency to the borrower via a commercial bank in Brazil. The Brazilian bank converted the foreign currency into Brazilian currency by means of an exchange contract, whereby the borrower sold the foreign currency to the bank for Brazilian currency at the official exchange rate periodically set by the Central Bank. The Brazilian borrower received a Certificate of Registration that enabled the borrower to effect payment of interest and principal in the foreign currency in which the loan was made. On each payment date, the borrower purchased foreign currency from a Brazilian bank at the official exchange rate. The Brazilian bank then tendered the foreign currency to the foreign lender. Payment of the Withholding Tax
Brazilian law prohibited remittance of an interest payment to a foreign lender without proof of payment of the withholding tax on interest remitted abroad. Under Brazilian law, the borrower initiated payment of the withholding tax by submitting a Documento de Arrecadacao de Receitas Federais (DARF) and the accompanying tax payment to a commercial Brazilian bank. Any bank making an interest payment *316 in foreign currency which was subject to Brazilian tax would require a completed DARF and payment of the tax as evidence that the proper amount of tax had been paid. [2] Thus, for net loans, payment of the Brazilian tax on interest remitted abroad occurred simultaneously with the payment of interest. *317 Institution of the Pecuniary Benefit
Under Decree-law 1,215, enacted May 4, 1972, the Brazilian Minister of Finance was given discretion to grant a reimbursement or reduction of, or exemption from, the withholding tax on interest provided that: (1) The borrower's costs were reduced; (2) the loan was of national interest; and (3) the loan complied with other conditions (such as minimum repayment terms) set forth by the Ministry of Finance. Decree-law 1,351, which was enacted on October 24, 1974, authorized the National Monetary Council [3] to temporarily reduce the income tax on interest, commissions, and expenses remitted to persons residing or domiciled abroad. On the same date that Decree-law 1,351 was enacted (October 24, 1974), the Central Bank issued Resolution 305, which temporarily reduced the tax on interest, commissions, and expenses received on cash loans registered with the Central Bank from 25 percent to 5 percent. *318 Decree-law 1,411, enacted July 31, 1975, amended Decree-law 1,351 and allowed the National Monetary Council to: (1) Reduce the income tax on interest, commissions, and expenses remitted to persons resident or domiciled abroad, or (2) grant pecuniary benefits to Brazilian borrowers receiving loans in foreign currency. On August 5, 1975, the Central Bank issued Resolution 334 which revoked Resolution 305, thereby reinstating the 25-percent tax on interest, commissions, and expenses paid on cash loans registered with the Central Bank. Mechanics and Amount of the Pecuniary Benefit
On the same day that the 25-percent tax on interest was reinstated (i.e., August 5, 1975), the Central Bank issued Resolution 335, which provided that borrowers taking out foreign loans duly registered with the Central Bank would receive a pecuniary benefit equal to 85 percent of the tax paid on the interest, commissions, and expenses due on such loans. Also on August 5, 1975, the Central Bank issued Circular 266, which provided in part that: a. a DARF would be used for the payment of the 25-percent income tax on interest resulting from foreign currency loans;
b. on the date of payment, the *319 banking establishment receiving the payment would, by means of a credit to the borrower's account, pay to the borrower the equivalent of 85 percent of the income tax; and c. the banking establishment receiving the tax payment would debit its own account entitled "Pecuniary Benefit -- D.L. 1,411," and would charge the total value of the pecuniary benefit against the Central Bank.
On July 26, 1979, the pecuniary benefit was reduced to 50 percent of the tax. On December 7, 1979, the pecuniary benefit was increased to 95 percent of the tax; on May 8, 1980, the pecuniary benefit was reduced to 40 percent of the tax; and on July 28, 1985, the pecuniary benefit was reduced to zero. Resolution 63 Loans
Many Brazilian companies that needed working capital were not able to provide foreign lenders with adequate financial information or proper guarantees to obtain a loan. To provide Brazilian companies with the funds needed for their development, and in keeping with the Brazilian Government's efforts to develop the country's economy and generate foreign exchange, the Central Bank issued Resolution 63 on August 21, 1967. Resolution 63 permitted certain Brazilian banks to borrow *320 funds from abroad for the specific purpose of relending (repassing) the corresponding borrowed funds in Brazilian currency to Brazilian companies (repass borrowers). The charges paid by a repass borrower to a Brazilian bank were in the same proportion as the charges paid by the Brazilian bank to the foreign lender. The loan between the foreign lender and the Brazilian bank was independent of the loan between the Brazilian bank and the repass borrower. The foreign lender had no legal relationship with the repass borrower and in general did not know the repass borrower's identity. Foreign loans which were repassed under Resolution 63 were subject to the same restrictions on the receipt and exchange of foreign currency as other foreign loans. Circular 266 provided that in the case of a Resolution 63 loan, the bank receiving the foreign loan was required to transfer the total value of the pecuniary benefit to the borrower receiving the repass funds, and in cases in which the foreign loan was transferred to several repass borrowers, the pecuniary benefit was transferred proportionally to each of such borrowers. Details of Repass Lending Under Resolution 63
Generally, a foreign *321 lender was concerned only with the credit risk of the Brazilian bank. The initiative to borrow foreign funds for lending to local companies under Resolution 63 was that of the Brazilian bank, which would repass loans if and when local borrowers were available. In making Resolution 63 loans to Brazilian banks, foreign lenders generally assumed that the Brazilian bank would pass through its cost of funds (the cost of the foreign lender's loan) and charge a spread or commission to the repass borrower. The Brazilian bank was allowed to charge its borrower only a repass commission. The repass commission was usually calculated as a set percentage per year of the principal balance of the repass loan. The amount of the repass commission was the same as the commission charged for other types of loans. During the years in issue, there was no limit on repass commissions, and the commission was as high as 10 percent, depending upon the individual repass borrower's credit. Except for the term of the loan, all other financial conditions of the loan between the Brazilian bank and the repass borrower had to be the same as those between the foreign lender and the Brazilian bank. If the interest *322 rate charged by the foreign lender to the Brazilian bank was net of the Brazilian withholding tax, then the interest rate payable by the repass borrower was likewise net of the Brazilian withholding tax. If the Brazilian bank was entitled to a pecuniary benefit, then it passed on such benefit to the repass borrower. The transfer of the pecuniary benefit from the Brazilian bank to the repass borrower reduced the repass borrower's cost of the repass loan, and thus encouraged foreign borrowing. Beginning in 1974, Resolution 63 funds not utilized in repass operations could be deposited with the Central Bank. When such funds were deposited, the Central Bank paid the interest on the foreign loan; and if there was a net loan involved, no withholding tax was paid with respect to the Central Bank's interest payment. Brazilian Tax Law
The Brazilian tax system is divided into three types of authority: the Federal Constitution of Brazil (Federal Constitution), the National Tax Code, and ordinary Federal, State, and municipal legislation. The Federal Constitution divides the authority to tax among the Federal Government, the States, and the municipalities of Brazil. Pursuant to Article *323 21 of the Federal Constitution, the Federal Government has authority to impose all types of taxes, including a tax on income, except as otherwise granted by the Federal Constitution to the States or municipalities. The National Tax Code establishes the parameters within which the taxing authority of the Federal Government, the States, and the municipalities may be exercised. It does not, in and of itself, create or impose any taxes. Article 4 of the National Tax Code specifies that the legal nature of a tax is determined by its generating factor (that is, the taxable event); the name and other formal characteristics of the tax are irrelevant to the legal nature of the tax. Article 113 of the National Tax Code divides tax obligations into principal and accessory obligations. The principal obligation is created by the taxable event, and has as its objective the payment of tax. The accessory obligation is derived from the tax legislation and has as its objective the performance of specific acts (e.g., maintaining books and records, filing returns) in the interest of collection of the tax. The taxable event which gives rise to the tax on income is the economic or legal availability *324 of such income. Under article 45 of the National Tax Code, the person entitled to "the economic or legal availability of income" is called the contribuente, or taxpayer. However, the status of the contribuente can be attributed to the holder of the assets producing the income or earnings. In addition, the source making payment of the income can be liable for the tax if such source is required by law to withhold and pay such tax to the Brazilian Treasury. Under article 121 of the National Tax Code, the person obligated to make the payment of the tax is called the "passive subject" of the principal obligation. The passive subject of the principal obligation is either: (1) The contribuente, when he has a personal and direct relationship with the taxable event or (2) the responsavel (responsible or person liable) when, without having the status of a contribuente, he has an obligation to pay the tax by an express provision of law. Article 122 of the National Tax Code defines the passive subject of an accessory obligation as the person obligated to perform the duties which comprise the accessory obligation. Article 123 of the National Tax Code specifies that, except as otherwise *325 provided by law, private agreements concerning the liability to pay taxes are not binding on the public treasury. Article 128 of the National Tax Code provides that the liability for a tax claim may be assigned to a third party who is related to the taxable event which gives rise to the tax obligation. Since 1943, Brazilian Federal legislation has provided for a withholding tax imposed on interest paid by Brazilian borrowers to foreign entities, at the following rates: Rate
Years
10%
1944-1947
15%
1948-1954
20%
1955-1958
25%
1959-1974
5% 1974-1975
25%
1975-Present
Norwest's Resolution 63 Lending Practices
Norwest's lending operations in Brazil were a "wholesale" operation. In making Resolution 63 loans to a Brazilian bank, Norwest contracted only with the Brazilian bank and not with the repass borrower. Thus, Norwest's credit decisions were based upon the credit worthiness of the Brazilian bank and not upon that of the repass borrower. Position of Parties
All of the loans at issue were net loans, and at all times the borrower (or repass borrower) received a subsidy from the Brazilian Government equal to a percentage of the taxes withheld. For tax purposes, *326 Norwest grossed up [4] the amount of interest Norwest received with regard to its net loans and claimed a foreign tax credit for the 25-percent withholding tax. Respondent argues that Norwest was not entitled to any foreign tax credits claimed with respect to Brazilian withholding taxes which Brazilian borrowers paid on Norwest's net loans on the theory that Norwest was not legally liable for such withholding taxes. Respondent also argues that the pecuniary benefits which the Brazilian Government paid reduced Norwest's payment of Brazilian tax, and correspondingly decreased Norwest's interest income. *327 Legal Analysis
Section 901 allows a domestic corporation to claim as a credit against its Federal income tax (subject to certain limitations not applicable herein) the amount of any income taxes which such corporation pays or accrues to a foreign country. The regulations make it clear that a credit under section 901 is available for foreign taxes paid on behalf of a domestic corporation. Sec. 4.901-2(a), Temporary Income Tax Regs., 45 Fed. Reg. 75648 (Nov. 17, 1980).[5]
A foreign tax is creditable only *328 if the taxpayer is legally liable for the tax. Sec. 4.901-2(g), Temporary Income Tax Regs., 45 Fed. Reg. 75655 (Nov. 17, 1980). Respondent claims that only the Brazilian borrower was legally liable for the Brazilian withholding tax on interest remitted abroad. Therefore, respondent argues, Norwest was not legally liable for the Brazilian withholding tax, and thus such tax is not creditable under section 901. For the same reasons expressed in Nissho Iwai American Corp. v. Commissioner, 89 T.C. 765 (1987), and in Continental Illinois Corp. v. Commissioner, T.C. Memo. 1988-318, affd. without published opinion sub nom. Citizens and Southern Corp. v. Commissioner, 900 F.2d 266 (11th Cir. 1990), which need not be repeated here, we hold that Norwest is liable for the Brazilian withholding tax and hence is entitled to a foreign tax credit. See also First Chicago Corp. v. Commissioner, T.C. Memo. 1991-44. We now turn to whether the pecuniary benefits or subsidies which Norwest's borrowers received from the Brazilian Government reduce the amount of foreign tax creditable under section 901. *329 Respondent contends that if Norwest was legally liable for the Brazilian tax, then the amount of the creditable tax must be reduced by the subsidies Norwest's borrowers received. The holdings in Nissho Iwai American Corp. v. Commissioner, supra, and in Continental Illinois Corp. v. Commissioner,supra, control the resolution of this issue. See also First Chicago Corp. v. Commissioner, supra.
As we said in Nissho Iwai: payment of the tax and receipt of the subsidy are in lockstep. Commonsense dictates that payment of the tax and receipt of the subsidy be viewed together in determining the amount of foreign taxes creditable for purposes of section 901. If we accept payment of the Brazilian tax as one transaction and receipt of the subsidy as another, we would ignore the true unity of the transaction and elevate form over substance; this we shall not do. [89 T.C. at 777].
In Continental Illinois, we explained that: We believe that the 1975 pecuniary benefit legislation was devised to maintain for Brazilian net loan borrowers the economic benefits of the 1974 withholding *330 tax reduction from 25 to 5 percent while restoring to foreign lenders the foreign tax credit benefits of a withholding tax rate of 25 percent. In the context of net loans, the 1975 pecuniary benefit legislation had the same economic effect as the 1974 tax reduction on both Brazilian borrowers and the Brazilian Treasury. Nor did the 1975 pecuniary benefit legislation change the pre-tax (U.S.) economic status of petitioners and other U.S. lenders with net loans. However, by providing inflated foreign tax credits for petitioners and other U.S. lenders, the 1975 pecuniary benefit legislation allowed petitioners and other U.S. lenders to benefit taxwise at the expense of the U.S. Treasury.
The purpose of the foreign tax credit is to reduce international double taxation. Here, disallowance of the pecuniary benefit portion of the tax does not subject petitioners to double taxation because the pecuniary benefit portion was not paid to the Brazilian Treasury. Following the enactment of the 1975 pecuniary benefit legislation, the Brazilian tax rate was in reality 5 percent, not 25 percent. [T.C. Memo. 1988-318; citations omitted.]
Norwest argues that our conclusion that Brazil enacted *331 its pecuniary benefit law to inflate foreign tax credits is contrary to the act of state doctrine. We disagree. The act of state doctrine shares with the doctrine of sovereign immunity a respect for the acts of a sovereign state. The act of state doctrine precludes a court from declaring invalid the actions taken by another government within its own territory. W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp. International, 493 U.S. 400,    , 110 S. Ct. 701, 704-707 (1990); Callejo v. Bancomer, S.A., 764 F.2d 1101, 1112-1114 (5th Cir. 1985). In Continental Illinois, we determined that for U.S. foreign tax credit purposes, the pecuniary benefit portion of the Brazilian withholding tax is not creditable. We did not declare invalid the Brazilian pecuniary benefit legislation. Nor do we do so here. Thus, the act of state doctrine is inapplicable. Consistent with our prior holdings, we hold that the subsidies Brazil paid to Brazilian borrowers herein reduce the amount of Norwest's foreign tax credit. Finally, Norwest argues that the subsidies which Brazilian banks passed through to repass borrowers in Resolution *332 63 lending transactions should not reduce its foreign tax credit. Section 4.901-2(f), Temporary Income Tax Regs., 45 Fed. Reg. 75653 (Nov. 17, 1980), provides: (f) Amount of income tax paid or accrued -- (1) In general. A credit is allowed under section 901 for the amount of income tax (within the meaning of section 4.901-2(a)(1)) that is paid or accrued to a foreign country, subject to the provisions of this paragraph (f). * * * * * * * (3) Subsidies -- (i) General rule. An amount is not income tax paid or accrued to a foreign country to the extent that -- (A) The amount is used directly or indirectly by the country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer; and (B) The subsidy is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer.
(ii) Indirect subsidies. A foreign country is considered to provide a subsidy to a person if the country provides a subsidy to another person that -- * * * * (B) Engages in a business transaction with the first person, but only if the subsidy received by such other person *333 is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the first person with respect to such transaction.
In a Resolution 63 loan, there are two different agreements: one between the foreign lender and the Brazilian bank and other between the Brazilian bank and the repass borrower. Albeit the Brazilian bank borrowed from the foreign lender in order to repass such borrowed funds to the repass borrower, the foreign lender had no legal relationship with the repass borrower, and the loan to the Brazilian bank was based solely on the Brazilian bank's credit risk. In fact, the foreign bank typically did not even know the identity of the repass borrower. Although the Brazilian bank transferred a pro rata portion of the subsidy to which it was entitled to the repass borrower, it did so because the Brazilian bank was allowed to charge the borrower only a repass commission. All other financial conditions of the loan between the Brazilian bank and the repass borrower had to be the same as those between the foreign lender and the Brazilian bank. Because the subsidy reduced the Brazilian bank's *334 costs, the Brazilian bank was required to pass such savings on to the repass borrower. Both the payment of the withholding tax and the repass borrower's receipt of the subsidy were inextricably linked to the transaction between the foreign lender and the Brazilian bank. Hence, the provisions of section 4.901-2(f)(3)(ii)(B), Temporary Income Tax Regs., supra, are applicable to Resolution 63 loans, and the subsidies paid to repass borrowers reduce Norwest's foreign tax credit. See Continental Illinois Corp. v. Commissioner, supra.
To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The borrower prepared the DARF and delivered a copy of the DARF and the registration certificate to the Brazilian bank (or U.S. branch bank) handling the payment of interest through a foreign exchange contract. The bank recorded the amount of interest and tax on the Certificate of Registration and submitted the certificate, exchange contract, and DARF to the Central Bank for approval. Upon approval by the Central Bank, the bank remitted the interest to the foreign lender and returned to the borrower a stamped copy of the DARF, the Certificate of Registration (stamped), and a copy of the exchange contract. The borrower sent a copy of the DARF to the foreign lender which then had proof (the DARF) that the withholding tax was paid. The lender performed no act in Brazil for the collection of tax.↩
3. The National Monetary Council is a Government agency responsible for economic programs. It acts through the Central Bank.↩
4. The withholding tax is computed as a percentage of the lender's gross income, and thus when a Brazilian borrower discharges a U.S. lender's tax obligation, a gross-up adjustment is necessary to determine the lender's gross income. For example, if the borrower was required to pay the foreign lender $ 9 in interest net of Brazilian tax, and the tax rate was 25 percent, then the amount of gross income would be $ 12 [$ 9 net interest received / (1-25% tax rate)] so that the 25-percent withholding tax would result in a tax payment of $ 3 ($ 12 gross income X 25% tax = $ 3 tax payment).↩
5. In November 1980, the Internal Revenue Service issued temporary regulations which set forth requirements for, and limitations on, the amount of foreign tax credit. These temporary regulations, secs. 4.901-2 and 4.903-1, 45 Fed. Reg. 75648-75658 (Nov. 17, 1980), generally were made applicable to taxable years ending after June 15, 1979. Final regulations under sec. 901 were made effective for taxable years beginning after Nov. 14, 1983. Sec. 1.901-2(h)(1), Income Tax Regs.↩